**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steven D. LOOS and Lorna Jo Taylor,**
**Defendants–Appellants.**

**Nos. 98–2150, 98–2170.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1998.

Decided Dec. 16, 1998.

Timothy A. Bass (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Jon G. Noll, Richard Kim (argued), Springfield, IL, for Loos Defendant–Appellant.

Eric M. Schwig (argued), Schwing & Salus, Springfield, IL, for Taylor Defendant–Appellant.

Before COFFEY, EASTERBROOK, and DIANE P..WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Two manufacturers of methamphetamine were captured when the process went awry and a fire broke out. Firefighters found the apartment's kitchen and the living room ablaze, and the bedroom appeared to be used as a laboratory. Explosions (several small and one large) occurred. After the conflagration was brought under control, firefighters summoned both fire investigators and police. Officer Power found cans of ether and paraphernalia that could be used to make methamphetamine. Concerned that volatile chemicals could detonate, Officer Power contacted the Drug Enforcement Administration. Agent Grootens of the DEA arrived at approximately 3:00 A.M., some 3½ hours after the fire started, and during the next hour conducted an investigation while the firefighters (who had never left the apartment) stood by to prevent the smoldering ashes from rekindling. By 7:00 A.M. the fire was out, the criminal investigation had

been completed, all hazardous chemicals had been removed, and everyone had left the apartment. Evidence gathered from the apartment formed the basis of this criminal prosecution. Steven Loos and Lorna Jo Taylor, the tenants, pleaded guilty to attempting to manufacture methamphetamine, see 21 U.S.C. § 841(a)(1), while reserving the right to appeal from the order denying their motion to suppress. Fed.R.Crim.P. 11(a)(2).

■■■■ Loos and Taylor contend that a warrant was essential to authorize the criminal investigation, because the firefighters could have called a hazardous-chemical disposal squad and cleaned up the apartment themselves in less time than it took the police and DEA to investigate. Like the district court, we grant the factual premise of this contention; the legal conclusion does not follow. Loos and Taylor rely on *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), for the proposition that the fourth amendment's requirement of a warrant in advance of a residential entry does not vanish just because the residence has experienced a fire. See also *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). But *Tyler* adds that entries that occur during the initial firefighting efforts do not require warrants, even if officials conduct a criminal investigation. In *Tyler*, as in this case, the fire broke out shortly before midnight. Firefighters soon arrived and extinguished the blaze; the police arrived at 3:30 A.M. and took pictures; the firefighters left at 4:00 A.M. but the police remained for a while and came back for a second visit at 9:00 A.M. to conduct an arson investigation. The police made a third entry 25 days later. *Tyler* held that only the third entry required a warrant. The first two were justified, the Court concluded, by exigent circumstances; and even though the police remained (and then reentered) after the firefighters had left, "[l]ittle purpose would have been served by [the police] remaining in the building [continuously], except to remove any doubt about the legality of the warrantless search and seizure later that same morning.... [T]he morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evi-

dence." 436 U.S. at 511, 98 S.Ct. 1942. Just so here. Criminal investigators came and went between about 2:00 A.M. and 7:00 A.M. on the morning of the fire, a briefer period than in *Tyler*, and the need for prompt investigation was more urgent because volatile liquids posed a risk of explosion. Firefighters remained throughout the investigation, as they had not done in *Tyler* (or *Clifford*, where the fact that firefighting efforts ended before the criminal investigation began led the Court to hold that a warrant was required). By all measures, this is an easier case than *Tyler*. Loos and Taylor would have preferred the fire department to deal with the risk of explosion by having the chemicals removed before the police and DEA were ready to preserve evidence, but that is not the function of the fourth amendment. Privacy interests in the apartment were compromised when the firefighters entered and saw drug-making chemicals and apparatus in plain view; defendants had no legitimate interest in having these seen or handled by one group of public employees (firefighters and hazardous-substances disposal personnel) rather than another (police and federal drug agents). See, e.g., *United States v. Boettger*, 71 F.3d 1410 (8th Cir.1995).

■■■■ Although Loos and Taylor were convicted of attempting to manufacture methamphetamine, they were sentenced under U.S.S.G. § 2D1.10, the guideline applicable to endangering human life while manufacturing a controlled substance. During the Rule 11 colloquy, defendants admitted that the fire in their apartment endangered the lives of persons in the building's other three apartments, and their own lives too. (Loos sustained burns; both Loos and Taylor were taken to a hospital after being evacuated from the building.) Guideline 2D1.10 adds three offense levels to the number computed using the drug-quantity table in § 2D1.1; functionally § 2D1.10 works the same way as a three-level enhancement via a specific offense characteristic added to § 2D1.1. Guideline 2D1.10 sets a minimum offense level of 20, so the effective enhancement for offenders who endanger human life while dealing in small quantities of drugs—less than 5 grams of methamphetamine, for example—exceeds 3

levels. But these defendants were caught trying to manufacture substantially more than that, so the 3–level enhancement was the only consequence of turning to § 2D1.10.

■ Loos and Taylor observe that the Sentencing Guidelines establish a charge-offense system and insist that the judge accordingly should have stuck with § 2D1.1, the guideline applicable to the manufacture of methamphetamine. But although the crime of conviction normally determines the appropriate guideline, there is an exception:

> Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted). *Provided*, however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline in section Chapter Two most applicable to the stipulated offense.

U.S.S.G. § 1B1.2(a). Loos and Taylor contend that their guilty pleas are not the result of an "agreement," but they made a plea agreement when they negotiated for and received the right to appeal from the denial of their motion to suppress. Rule 11(a)(2) provides that a conditional plea is possible only with the assent of the prosecutor and judge, so some "agreement" accompanied this plea. It was not an agreement on any of the items listed in Rule 11(e), but § 1B1.2(a) is not limited to agreements within the domain of that subsection. Agreements reached under Rule 11(a)(2) differ in scope and formalities from those under Rule 11(e), but they are still "plea agreements" for purposes of § 1B1.2(a).

That leaves the question whether defendants' acceptance of the prosecutor's evidentiary proffer was "a stipulation that specifically establishes a more serious offense than the offense of conviction". The prosecutor narrated events that put the defendants' conduct within the domain of § 2D1.10; they acknowledged that they had caused a serious fire in an occupied building while trying to make illegal drugs; thus the only real question is whether their acknowledgment is a "stipulation" within the meaning of § 1B1.2(a).

■ Reading "stipulation" strictly, as a formal agreement on specific language, would be appropriate if the function of the proviso in § 1B1.2(a) were to link the choice of guideline to the crime of conviction, unless the defendants consented to the use of some other guideline. Then the formality of the stipulation procedure would be the means for defendants to give or withhold consent to the use of a guideline for a more serious offense. But if § 1B1.2(a) is a grant of authority to the court—rather than an option for the defendants to use in plea bargaining—then it is best to read "stipulation" as any step that reflects the defendants' acknowledgment of their conduct. On this latter reading, the proviso to § 1B1.2(a) allows a judge to move from one guideline to another in lieu of departing from the guideline for the crime of conviction. Moving to the guideline that matches the defendants' agreed conduct is more disciplined than an ad hoc departure, and it holds out greater prospect of treating similar conduct the same way. Application Note 1 to § 1B1.2(a) tells us that the latter reading is superior:

> The exception to the general rule has a practical basis. In cases where the elements of an offense more serious than the offense of conviction are established by a plea agreement, it may unduly complicate the sentencing process if the applicable guideline does not reflect the seriousness of the defendant's actual conduct. Without this exception, the court would be forced to use an artificial guideline and then depart from it to the degree the court found necessary based upon the more serious conduct established by the plea agreement. The probation officer would first be required to calculate the guideline for the offense of conviction. However, this guideline might even contain characteristics that are difficult to establish or not very important in the context of the actual offense conduct.

That explanation nicely fits our case. A judge who started with § 2D1.1 would be entitled to depart on account of the risk to

life that Loos and Taylor created. Cf. § 5K2.5. But what is the right departure? The drug-quantity table does not offer assistance. Guideline 2D1.10, by contrast, tells the judge exactly how much to adjust the sentence to account for the life-threatening aspects of the conduct. Going straight to § 2D1.10, rather than starting with § 2D1.1 and departing, well serves the Guidelines' general function of imposing similar sentences for similar conduct. That objective is achieved by reading "stipulation" to mean any acknowledgment by the defendant that he committed the acts that justify use of the more serious guideline. *United States v. Braxton*, 903 F.2d 292 (4th Cir.1990), reversed on other grounds, 500 U.S. 344, 111 S.Ct. 1854, 114 L.Ed.2d 385 (1991), understands "stipulation" in this way, and we think correctly so. Defendants' protection against undue severity lies not in reading "stipulation" as requiring a formal agreement (under seal, perhaps?) but in taking seriously the requirement that the basis of the more serious offense be established "specifically". See *United States v. Domino*, 62 F.3d 716, 720–22 (5th Cir.1995). That was accomplished here, and the district judge therefore properly applied § 2D1.10.

■ Loos has one final argument. His sentence of 135 months' imprisonment exceeds the 10–year maximum for 21 U.S.C. § 858, which makes it a felony to endanger human life while attempting to make illegal drugs. Having chosen § 2D1.10 as the guideline, Loos contends, the judge also should have respected the maximum punishment in § 858. The Sentencing Commission addressed this possibility directly: "The sentence that may be imposed is limited … to the maximum authorized by the statute under which the defendant is convicted.... For example, if the defendant pleads guilty to theft, but admits the elements of robbery as part of the plea agreement, the robbery guideline is to be applied. The sentence, however, may not exceed the maximum sentence for theft." U.S.S.G. § 1B1.2 Application Note 1. The statutory maximum for attempting to manufacture methamphetamine, the crime of which Loos was convicted, is 30 years' imprisonment; his sentence therefore is lawful.

AFFIRMED.